Thank you, Judge Piazza. May it please the Court, Theodore Griffith representing HBO, I'd like to reserve three minutes for rebuttal. Sure. Lead through the lens of validity or scope. The fundamental question here is the same. To paraphrase the Supreme Court in Lytton, the crux is whether the dispute here about HBO's airing of the 2019 documentary Leaving Neverland has its real source in an unrelated 1992 agreement which concerns a completely different film and contains an arbitration provision. The answer to this question is of course not. As a Supreme Court held in Granite Rock, a court may order arbitration of a particular dispute only if the court is satisfied that the parties agreed to arbitrate that dispute. So, Mr. Petros, can I ask you, so let's assume, I know you don't agree with this, so I want you to assume for a second that there was a, let me just ask you, is there any, a legitimate claim under the disparagement or confidentiality provisions of the contract, which are in that Exhibit 1, I think. Are there, is there any legitimate claim under there that you would argue does not need to be arbitrated? Or are you, what I'm trying to figure out is, are you, are you thinking there's some scope of disparagement and or misuse of confidential information that would violate the contract but would not need to be arbitrated? Or do you agree that if it, if it's covered by the contract that it would need to be arbitrated? I'm trying to figure out what you disagree. Yeah, Your Honor, we, we believe that with respect to the non-disparagement clause, that clause has no language or anything to suggest it survived the performance of the contract. The background rule is very clear. So that's not quite what I'm getting at. What I'm getting, let's assume for a second that, I think a hypothetical might help here. Let's assume for a second that the day after the Live in Budapest, so way back in 1999 or whatever it was, the day after, they play HBO's like, and you know, commercial during the Live in Budapest says, tune in tomorrow for Finding Neverland, right? You know, so the day, so, and so let's say there was a disparagement slash non-confidentiality claim within the period you're saying, et cetera. Do you think that would need to be arbitrated? Or do you think that type of claim would need to be, would, would not, would fall outside the arbitration agreement? And so got it, Your Honor. Yeah. I believe that, you know, a complaint, you know, a disparaging remark by HBO about Live in Budapest shortly after it aired would be subject to the arbitration clause. So here, the problem is that our, the non-disparagement clause does not contain any language that suggests it goes on beyond the contract, let alone forever, let alone perpetually. Counsel, let me ask you about that. What if in the course of filming the Live from Budapest, some camera person, for example, got confidential information, overheard Michael Jackson talking something that would be disparaging, and then today told somebody or publicized it, would that violate the, you don't think the confidentiality clause and non-disparagement would cover that? Your Honor, I think that's a very good point. And I think that goes to the distinction between the confidentiality provision, which arguably it's not an issue here, but the rights were vested in that. In fact, the confidentiality provision applies to information that was obtained prior to or during the relationship. And it restricted disclosure at any time, including afterwards. So arguably, if that was what this case was about, there might be a claim that the arbitration clause was triggered here. But here, the non-disparagement clause lacks that language and does not say disparagement at any time. In California law and federal law, as I was saying. I'm going to ask you one third question. So this is helpful. I think Judge Irwin asked to nail down something I was wondering. So the additional question is, I get the impression from your briefing, and I see your argument, that it's silly that you'd have a disparagement clause in perpetuity, so to speak. But I want to nail down, do you actually think it would be possible for somebody to say, here's a sweet opportunity? That's what the other theory is. This was like a really sweet opportunity for HBO to be able to play this. I know you don't think that this disparagement clause covers that, but is there any reason why somebody couldn't say, you want this really good deal? You promised to never, ever, ever in perpetuity disparage me. I'm a boxer or something, and I don't want you saying bad things about me. So do you think it would be possible to have one, but just this one doesn't cover? Or do you think it would not be possible at all to have a disparagement clause that lasts in perpetuity, like somehow that violates something? If you put your finger on it, if the parties had said ever, never, you never can disparage or let alone do another film that is in perpetuity. There's no language like that, and it's completely unreasonable. Given away its first amendment rights to Michael Jackson in his estate, the police are filming content forever, including on great interests of public rights. 20 years later, that's just on its face, and there's nothing in it that's non-disparaging. Yes, HBO intended that, or that Michael Jackson intended it, and even beyond. Okay, so given those things, this is kind of where I am on this. So we agree up to this point, but you're probably going to disagree with my next statement. But given all of that, how are you not just arguing? I think it's black letter law, and I know you're trying to say that, well, this should all be used to influence the scope of the arbitration clause, but it's black letter law that the arbitrator is the one who would in theory decide the substantive meaning of a claim. If you were saying they violated a contractual provision, if they were saying that you violated the contractual provision about replaying the live and boot pest, it would be, but it was some nuance, the arbitrator would be the one deciding that. So that's what it seems like this is here. If you're acknowledging that you could in theory have a disparagement clause that lasts, just that this one doesn't last, and you're acknowledging that if the disparagement clause is covered, it would need to be arbitrated, which I think, I'm glad you agree with that. I think that's got to be right. Then why wouldn't it be up to the arbitrator to decide the issue that you are trying to get us to decide in order to decide that we can't, this can't go to an arbitrator? Judgment, that takes me right back to the Litton case, because it's exactly what the union argued in Litton, that the court should not interpret the provision. There was whether a contractual, a post contractual right invested regarding layoff order. Even the dissent argued that the court couldn't consider the meaning of the substantive provision because that went to the mirror. And the Supreme Court said, we have a duty when our, when the arbitrability issue is vested with the court, which it is here, the district court found that that's not been, you know, the court has a duty to interpret the substantive provision of the contract to see whether the dispute has its real source in the contract. And footnote four Judge Van Dyke, I commend it to you. The court says we realize by necessity, we're deciding that issue that went to the merits, whether there was a substantive post expiration, right. But we have to do that in order to fulfill our duty to determine whether the claim was arbitrable. And that's what the issue is. So I hear what you're saying there. In some ways, that sort of reminds me of sort of the old rule 23 class action, where it used to be battle days. They used to say, can't look at the merits, anything that relates to the numerosity, any of those things. So I think there's a, there's a parallel there. So I get your point there, but there's also true. I think you'd have to concede that there is a rule that you have to fit that typically the merits issues as to the, what a contract clause means or something would be decided by the arbiters. So what's left on it? Where do you draw that line? Right. I mean, it seems to me you're really intruding into the merits. You'd have us decide that you want us to decide that the non-disparaging clause, what it means, what it covers. And you also want us to decide that it's expired and it doesn't apply anymore. And so if we decide those things in order to determine, right, I think you're arguing that we have to decide those things in order to determine that, that, that the arbitration clause doesn't cover what's left for the arbitrator to decide on the merits of it. Nothing, Your Honor, because this case is not overproven. And as Litton makes clear, and I think this court's decisions and the Supreme Court decisions, we've cited them in our report. This happened in the Duke's case, the class action case, Your Honor, Walmart, the Supreme Court said, sometimes there's an overlap with the merits in jurisdiction. And this is basically a jurisdictional question, preliminary injunctions, class certification, and there's nothing unusual about that. Here, this is so far afield, Your Honor, the notion that in 1992, so what about Litton? I mean, Litton, they didn't dispute that the contract, that the agreement had expired, right? That in the court, in our court, I think in the International Alliance of Theoreticians, you know, the case, NSYNC, NSYNC, I call it NSYNC, our court specifically said Litton just doesn't apply where the parties dispute whether or not, whether they dispute the effect of an evergreen clause, or I think would be the same thing saying where the parties are disputing that, that the contract is not expired, at least in this case, the American part. So how is Litton on point when we've got on-point authority from our circuit saying it isn't? Litton is on point for two reasons. First, Your Honor, I think, as I said, I don't think it matters whether the court looks at this as a validity or a scope issue, the way it's all kind of played out here. But one way to look at it is there's still a valid arbitration clause that governs the disparagement claim. Another way to look at it is does the dispute here fall within the scope of a nondisparagement clause in the arbitration agreement? In NSYNC, there was no dispute that the termination clause issue fell within the scope of the arbitration clause. The court said that. And in this court's decision in Los Robles, which the estate brought to the court's attention yesterday, the court noted that those termination clause issues are very unique and they are different than the kind of scope and validity issues that we've raised. And so, yes, Judge Pyle. Go ahead. Finish up, Mr. And then I'll ask my question. Finish. That was the only point I wanted to make. Okay. So, Mr. Boutros, let me ask you, is your argument that the agreement is over and done with and terminated? Or is it this dispute doesn't arise out of the disparagement clause? It's really both. We have alternative arguments. On the one hand, the agreement was fully performed and under black letter law, it's over. Some rights may have vested before it was over and be enforceable. Judge Hummer got to the point, there could be an argument that some information was disclosed later and that that right to not have. There's actually. What if HBO dusted off the, you know, it turns out they didn't return all the tapes, you know, and they found one in their basement. They just played live in Budapest. That would be under this. You could sue you for violating the contract on that, right? That's really my point. Those things have to do with live in Budapest and the information covered by the agreement. I think the contract is completely over. So what about the second that Judge Pyle is a second? I think that that's really the simplest way to resolve this case is to look at it as a scope issue. The question is, did the parties intend to litigate, to arbitrate and to provide a right to arbitrate this dispute in 2019 when they agreed? One of the big policies of the FAA is arbitration is a matter of consent. And here, the nondisparagement provision is not perpetual. It was it was we submit limited to. Why isn't that a question for the arbitrator, though? Because that goes to the question of arbitrability, your honor, the judge, the district court. And here's where the court, I think the district court, ultimately at the state stage, said this contract in 1992 has nothing to do with anything in this case. We have a presumption in favor of arbitrability. I think the case that you just sent us yesterday or the day before from Judge O'Scanlan, I mean, Judge O'Scanlan, he specifically framed that issue. I think he basically said he framed it to be a prong one instead of prong two. You're saying it's a prong two in order to. But if it's under prong two, O'Scanlan said, yeah, well, then there's a heavy presumption in favor of arbitration. And your honor, in Los Robles, which our author talked about Granite Rock and how Granite Rock said that the presumption in favor of arbitration cannot override the consent issue in agreement of the parties. And back to Judge Pai's point, your honor, that goes to arbitrability and that the very beginning. That's why I think I asked, or I can't remember now whether it's me or Judge Dermogood, but I think you acknowledged that if this falls within the scope of the disparagement clause, then it is arbitrable. You don't have any disagreement that the parties agreed to arbitrate whatever is within the scope of the disparagement clause. Ultimately, your fight is that you don't think the disparagement clause covers this. But again, Judge Pai's question, why isn't that a question for the arbitrator? Well, because the scope question requires the court has a duty. The district court didn't think it was allowed to interpret the non-disparagement clause and determine whether it continued in effect. And that's an arbitrability question, a scope question. And as to the presumption, the presumption here faded like a dying comet over 28 years. The party's conduct, the estate didn't even mention this contract or the arbitration clause or demand arbitration in its letter before the debut of Leaving Neverland. It filed an action in court that made detailed complaints basically as a publicity stunt and asked for a public arbitration, which goes directly contrary to the FAA's policies of keeping actions out of court, because this agreement has nothing to do with Leaving Neverland in this dispute. And no one would have agreed without clear language to give up its rights to broadcast child molestation allegations of such grave importance forever about one of the most famous public people in the world. And if I can reserve the rest of my time for rebuttal, if I have any. I'll give you some time for rebuttal, Mr. Boutrous, don't worry. Okay, let's hear from your opposing counsel. Okay, I'm assuming you can hear me. Good morning, your honors, and may it please the court. Jonathan Stein Sapir of Kinsella Weitzman for the FLE's Optimum Productions and the co-executors of the estate of Michael Jackson. I just want to start by, and I think this is some of the questions that Judge Van Dyke was going to, which is, and we just saw it, HBO is absolutely not arguing that the arbitration clause itself has expired. It's arguing that the contract as a whole is its arguments are directed at whether the non-disparagement clause has expired. And for example, if we assumed that this 1992 contract did not have an arbitration clause and just had a forum selection clause for the state and federal courts of Los Angeles County, HBO's argument wouldn't be that the forum selection clause is invalid or that the forum selection clause violates public policy because it creates a quote, perpetual forum for a court to resolve these issues. No, HBO would be arguing what they're arguing, which is that on a 12 v six or a motion for summary judgment, that the non-disparagement clause has somehow expired, even though there's no language to that effect, or it would be arguing that the scope is much more narrow than its very broad language says. And all we are asking for, the only relief we are asking for is that HBO simply litigate these issues, which Mr. Boutros and his colleague, Mr. Petricelli are extremely confident in, in the forum that the parties chose. That forum is one that these sophisticated parties bargained for, and it is before a retired judge of the superior court. And as the Supreme Court unanimously said in Henry Schein, um, you know, arbitrators are fully capable of dealing with frivolous cases. We don't believe this case is frivolous. They apparently do, but I can tell you from personal experience, not directed at me, I've seen arbitrators sanction parties for bringing frivolous cases. Um, they're generally, and have to be in this case, a retired judge judges when they leave their courtrooms and retire and become arbitrators, they don't lose their, their stripes, so to speak. You know, they, they continue to be tough on parties who bring, um, baseless claims. Now on this perpetuity issue, um, I, I, um, this is an issue for the arbitrator. Absolutely. But I do want to just make a few remarks about this. I mean, perpetuity, first of all, 1992 was not, well, it wasn't forever ago. I remember 1992. I'm sure your honors remember it. I even remember, uh, watching this concert at HBO on HBO when I was a junior in high school. Okay. And HBO is simply wrong that we don't have a comparable case with the same amount of time, not a comparable case, but amounts of time. We have longer ones. Um, to give you an example, we cited the second circuit's case in continental insurance. In that case, there was an arbitration clause from 1975. The party stopped dealing with each other in the eighties yet in 2002. And despite there being some intervening agreements in the eighties, the second circuit compels arbitration under that very old contract from 1975. And in district court, we cited cases that were even older. We had a 2011 case that, um, that, uh, compelled arbitration from based on an agreement from 1979. Um, and that's at SCR one 71. I forget the name of the case, but we specifically called it out because we were responding to this. It's just too old, which is not a principle. Sure. Let me, let me ask you a question though. Um, in the example that we have in this particular case where the connection between the disparagement and the original, uh, live from Bucharest concert filming, it's not obviously related on its face. Uh, why does that matter? So, I mean, to the point is, did anyone contemplate, or should we be weighing in at this point to say, boy, this is kind of ridiculous. Anytime HBO airs anything that could be construed as disparaging. I can't see what the parties agree. Sure. So to, to directly answer your question, no, you should not say that this is ridiculous, but, but, but more, more specifically, no, there does not need to be a connection. And let me, again, just give me just one minute on non-disparagement clauses. Look, I, we generally see non-disparagement clauses, at least as a litigator in business divorce cases. So when has a negotiated one with, with the lawyers on the other side of this case and in a different case and the idea that the, that the, um, non-disparagement has to have a relationship to the settlement agreement or to the breakup of the partnership. I mean, that's absurd. That would mean that one former partner could not say that his former partner was a bad business person or didn't know how to make widgets or whatever they were doing, but he could call that person a Nazi. He could call that person a, you know, puppy killer and all these sorts of disparaging things. I mean, I can't imagine telling my client that we have to list out every single thing. You're not allowed to disparage someone about, and let me explain why, because we all as human beings know that we can be disparaged for reasons that we just can't even imagine. There might be a kernel of truth in the disparagement, but it's been twisted out. You know, people who, you know, enablers of child molesters, because we represent Michael Jackson. I mean, that has absolutely no truth. And I would have never thought to put that in a non-disparagement clause if I ever signed one with anyone. But the fact of the matter is they are never limited in subject matter. And by the way, we all know there's thousands, if not tens of thousands of non-disparagement clauses in this great state of California. And where is the other side citation to a single one, a single case that limits it to the subject matter of the agreement? And there isn't one. And with Michael Jackson specifically, I mean, this is in our complaint, so the court can certainly look at it. But, you know, Michael Jackson in 1992, although the allegations of child molestation have never been made, had been the subject of some extremely ridiculous tabloid reporting. So it's not crazy that he would want that in an agreement. And and frankly, this was the price he wanted for this concert. As Judge Van Dyke said, this was a very sweet opportunity for HBO. This was a once in a lifetime opportunity. This was Michael Jackson at this time or the allegations was without question the biggest star the world had known to that day. And, you know, I'm biased, obviously, but of course they wanted this concert, the first televised concert in history. It was the biggest thing they ever did. And the fact of the matter is HBO has extremely talented lawyers. We're seeing them today. And this got past them. You know, I mean, I don't think there's there's you know, you go through this language, you go, you couldn't have made this any more broad. So, Mr. Steinberg, let me I want to ask you the same question I kind of asked Mr. Boutros, and that is getting to the arbitration agreement itself. Is your argument that this dispute arises out of or is in connection with the agreement over? Absolutely. One thousand percent. And it is so because of the disparagement clause. Absolutely. One thousand percent. And go ahead. Judge Immigrant, I think it was Judge Immigrant who suggested, I mean, this is pretty remote, isn't it? Well, is it remote to the subject matter of what live in Bucharest? Well, no, because the agreement, the confidentiality provisions are a material part of the agreement. I mean, if you read them, they say these are a material inducement to the licensee and the performer to enter in the agreement. This was part of the price that Michael Jackson asked for and that HBO agreed to. And the best evidence that that was part of the price is the fact that they're part of the agreement. I mean, the confidentiality information is two lines up from the arbitration clause, two lines up. It says it is understood that HBO should be quiet. You go before the arbitrator, the arbitrator, Mr. Boutros argues strongly. This doesn't fall within the scope of the arbitration clause. The arbitrator says, yeah, I think you're right. What happens then? You go back to the superior, you go back to district court. Well, the question would be whether HBO is judicially stopped from making that argument, because we had actually we had actually said arbitrability is for the arbitrator. They litigated and won that issue. But assuming that he could, let's assume that an arbitrator still says, you know what, I'm the arbitrator. I got jurisdiction. If he says that, then I lose. Right. I mean, then then I lose. Do I go back to the superior court? I guess I could. And that kind of comes if it's just if it's just on arbitrability. I don't think an arbitrator would do it just on arbitrability. I would think that you would say I'd lose on the merits, in which case I'm out of luck unless I can get it within one of these tiny exceptions to vacating an arbitral award, which is not easy, you all know. But but but this I think this just kind of gives up Mr. Boutros's argument, which is he doesn't cite a case where a court says that that a matter is not arbitrable. Therefore, the whole case is over. And on Lytton, Lytton doesn't apply for reasons that their honor from NSYNC wrote. There's a very real dispute on expiration. But on Lytton. And I think Mr. Boutros just made a mistake. In that case, the Supreme Court very clearly in the last footnote of Justice Kennedy's majority opinion says that they may be able to go back and state a claim for unfair labor practices under the National Labor Relations Act and before the NLRB. It's just that it's not an arbitrable issue under the CBA. So the whole point what HBO has said throughout this entire thing is this is an arbitrage arbitrable. And because it's not arbitrable, you lose on the merits. Well, that's that's just not how arbitrability works under the federal presumption of arbitrability. And this all of these issues about the length of time, about the scope, about the First Amendment issues. These are all things arbitrators are fully competent to rule upon. And really what I think my friend's arguments on the other side is that, well, we just don't trust arbitrators to rule on this stuff. But that kind of argument, for better or for worse, has been rejected by the Supreme Court repeatedly, most obviously in AT&T versus Concepcion, where it was HBO's corporate parent, AT&T, that pushed that interpretation on the federal courts. And that wasn't in agreements like this that were negotiated for millions of dollars between very highly sophisticated parties. Those were consumers that signed these contracts that are a thousand pages long that no one reads. Yet now, when the shoe is on the other foot, HBO and AT&T are fighting tooth and nail, saying that arbitration is just unfair. To address Granite Rock, which Mr. Boutros raised, that's about contract formation in NSYNC. I forget the footnote, but it specifically distinguishes contract formation from expiration termination issues. That's also, the Supreme Court does so in Buckeye in footnote one. And the NASA services case by Judge Van Dyke that was cited in the reply brief, that was also a contract formation issue. Contract formation issues are always for the court. We know that from all the cases we decided, but also this court's decision by Judge Hall in Sanford versus Member Works, which is from 2007. It's cited in our brief. But issues as to expiration termination, et cetera, unless it is directed specifically at the arbitration clause, it is for the arbitrator. And the one case I would commend your honors to, although it's not from this circuit, it is the DC Circuit's case in, I think it was called the National Railroad Passenger Corporation, where they say that, look, as to questions of length, the parties have it completely within their power to put a time, date, minute at which they expire. But if they don't put it in there, we have to exercise our office of interpretation, say there's an ambiguity, and once there's an the arguments that Mr. Boutros is raising that some of you might be sympathetic to, just be resolved in the forum the parties chose, just as if there were a forum selection clause for the Central District of California, it would have been resolved there. I have one further point, but I wanted to see if there were any other questions. I just have a practical question. Are the arbitration proceedings underway? No, they're not. They were stayed pending appeal by Judge Wu. Okay. All right. Okay. And just the one final point I wanted to make, it's just because I was shocked to see it in their brief, and it did touch on it in our 28-J letter, but I just want to say it again. We never, the idea that we waive the argument that contract expiration is for the arbitrator is just flat wrong. We cited it. We made this argument in detail in every single brief. We even cited McKinney. The citations were in our 28-J letter, so I won't give them to you there, but single brief, including in state court. And with that, unless your honors have other opinions, I just respectfully request that the district court's correct and well-reasoned opinion be affirmed. Thank you. Okay. Mr. Boutros. Thank you, your honor. First, let me talk about Litton, because Litton basically held that whether an agreement is expired or not expired, the crucial question does go to scope. And the question is whether the dispute has its real source in the contract with the arbitration clause. In that case, as I said, the party made the exact argument. It said that an issue of contract interpretation to be submitted to an arbitrator in the first instance is what was at stake there, rather than whether it was an arbitrable issue, and that we'd be deciding the merit. And the court said, we have an obligation to the page 208 and 209, this literal exact same argument. And in footnote four, the court said, we are deciding whether there's a right under this contract, a substantive right. And we're finding that there's not, and the issue is not arbitrable. There may be a statutory argument, but there's no contractual argument. And that is a crucial holding in Litton. It applies, as Las Roblas held, you know, it's just the same in commercial cases, whether or not this agreement can be viewed as expired, which it is. It was fully performed, whether other rights survive is a different issue. Counsel says that I haven't cited a single case. The radical position here is, counsel hasn't cited a single case where a court has found that a 30-year-old contract on a completely different subject creates a perpetual right to arbitrate in this context. That is unprecedented. And it's not that we don't trust arbitrators. Consent is crucial. There was no agreement to arbitrate. And it's unreasonable to assume HBO without explicit language would have given it up its right to disseminate information of such important public concern. Thank you. Okay. Thank you, Mr. Boutrous. Thank you, counsel. Interesting case matters submitted at this time. Thank you.
judges: Paez, Immergut, Vandyke